## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: Steven Norman Holland,<br><br>Debtor.<br>------------------------------------------------<br>James M. Jefferson,<br><br>Plaintiff,<br>v.<br><br>Steven Norman Holland,<br><br>Defendant–Debtor. | Bankruptcy No. 08-B-06400<br>Adversary No. 08-A-00320<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on an adversary proceeding brought by plaintiff James M. Jefferson against the Defendant-Debtor, Steven Norman Holland, seeking to declare certain amounts purportedly owing by the Defendant to the Plaintiff under a defamation claim non-dischargeable under 11 U.S.C. § 523(a)(6). For the reasons set forth herein, the Court will find in favor of the Defendant.

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## **FINDINGS OF FACT**

The following facts and procedural history are taken from the Plaintiff's Complaint, the Defendant's Answer to Complaint, and from the testimony and evidence presented and admitted at the trial held on March 11, 2010.

### A. Mr. Jefferson's Employment at New Millennium

The Debtor, Steven Holland, is the sole owner and president of New Millennium Mortgage Corporation, an Illinois corporation which originates residential mortgage loans. The Plaintiff, James Jefferson, was a loan officer, and then director of loan operations, for New Millennium from February 2002 until April 2006. As a loan officer, he located clients and provided them with loan commitments from various lenders. As director of loan operations, he continued to act as a loan broker, but also oversaw other loan officers.

Mr. Jefferson was hired personally by Mr. Holland. At the beginning and for several years they had a good relationship, but after a dispute arose over the way Mr. Jefferson was compensated, the relationship soured. Mr. Jefferson quit and the events leading up to this proceeding occurred.

In his both his capacity as a loan officer and later as a finance director, Mr. Jefferson was paid on a commission basis. He originated between $50 million and $75 million in loans per year, which was a large amount for the company. In fact, every year that he worked for New Millennium, Mr. Jefferson received an award as the top producer of the year. He produced three or four times more loans per year than almost any other loan officer at the company. For this, he received between $300,000 and $500,000 per year in commissions. At least until April 2005, his commissions were calculated monthly. Loan officers were paid a draw in the middle of the

month, which was offset against the month's commissions, and were paid the remainder of the month's commissions at the end of the month. A monthly commission statement was delivered with this payment at the end of the month. Up until April 2005, Mr. Jefferson was paid based on a formula: for each loan he originated, $500 was deducted off the top and he received a commission of 30% of the company's profit above that amount. The $500 represented the average costs for a transaction, such as the costs of appraisals, tax service fees and internal costs. In his capacity as a finance director, he received a commission of 10% of the profits above $500 for loans originated by officers he oversaw.

Starting in April 2005, and for 10 months thereafter, Mr. Jefferson stopped receiving commission statements. As an excuse for not delivering commission statements, Mr. Holland told him that the company was having issues with the accountants and had lost some employees. Mr. Holland assured him that he would receive bimonthly draws until the accounting was straightened out. However, the draws he received were substantially less than the commissions he was due. In the beginning of 2006, Mr. Jefferson finally received his commission statements for the prior 10 months, but they were calculated using a different formula. Under the new formula, he still received the 30% of profitability (or 10% for loans originated by officers he oversaw), but instead of deducting a flat rate of $500 off the top for each transaction, there was a deduction of $500 plus the 'actual expenses' in connection with the transaction. Mr. Jefferson never agreed to the new formula, and Mr. Holland did not inform Mr. Jefferson that he intended to change the way his compensation was calculated in advance. Mr. Jefferson only learned of the change when he finally received the monthly commission statements for the missing 10 months in February 2006. But, by that time, he had worked for 10 months thinking he was going to be

paid using the old formula. Mr. Jefferson estimates that his commissions for that 10-month period were tens of thousands of dollars less than they would have been using the old formula.

Mr. Holland alleged at trial that Mr. Jefferson was overpaid, but seems to have admitted that the old formula was in effect and correct at least for some period of time. Mr. Holland alleged at trial that the company had changed the compensation formula, but admitted that the change occurred sometime after Mr. Jefferson began working at the company. He alleged that all employees signed an agreement changing the compensation policy, but offered no evidence other than his own testimony. Moreover, he admitted that he did not have an agreement signed by Mr. Jefferson, and Mr. Jefferson testified that he was never informed of any change in compensation policy.

Even under the new formula, Mr. Holland admitted that New Millennium owed Mr. Jefferson at least $52,000 for back commissions from the 10-month gap. Initially, starting with the mid-February 2006 draw, New Millennium began repaying these back commissions by adding an additional $5,000 to the bimonthly draw. However, after a month or two they stopped, and the mid-April draw did not include the extra $5,000. When Mr. Jefferson confronted Mr. Holland about the cease in payments, Mr. Holland confirmed that he would no longer pay the extra $5000 for back commissions, and insinuated that Mr. Jefferson had not had a right to be paid under the old formula even before April 2005. In response, Mr. Jefferson notified Mr. Holland that he was resigning, and indicated that he planned to move to Chase. He was originally going to quit immediately, but Mr. Holland persuaded Mr. Jefferson to stay on at New Millennium until the end of the month. In the loan origination industry it is unusual to continue working for any period of time after resigning. New originations do not usually close for 5 or 6

months, so a departing employee would not receive the benefits of the new origination. However, Mr. Jefferson agreed, in part, so that he could receive the commissions on the transactions he had closed in the first half of the month and those that were scheduled to close during the remainder of the month. Mr. Holland represented to Mr. Jefferson that he would get paid for that month.

When he heard that Mr. Jefferson had a position lined up at Chase, Mr. Holland asked if Mr. Jefferson could set up a meeting with his contact at Chase. Mr. Holland indicated that he was interested in the possibility of turning New Millennium into a Chase branch. Mr. Jefferson set up the meeting between Mr. Holland and Mr. Jefferson's contact, Kevin Christopher. The meeting took place, but Chase was not interested in Mr. Holland's proposal. The next day, the relationship between Mr. Holland and Mr. Jefferson changed from sour to acrid.

### B.     The Cell Phone and Allegations of Embezzlement

On April 24, 2006, the day after Mr. Holland's failed meeting with Mr. Christopher, Mr. Jefferson discovered that his cellular phone had ceased to work. He contacted Cingular, and learned that someone claiming to be himself had called, given his social security number, and changed the phone number over to a phone with Verizon. Mr. Jefferson called Mr. Holland, and it quickly became clear that Mr. Holland had had the phone number transferred. They argued and Mr. Jefferson quit immediately. He was never paid for his April commissions or for the back commissions owed as of that date.

Apparently Mr. Holland felt the phone number belonged to New Millennium, but Mr. Jefferson testified that he had obtained the cell phone and number before he began working at

New Millennium. New Millennium did reimburse him for his use of the cell phone while he worked there, but it was unclear from the testimony whether Mr. Jefferson paid the bills directly and was reimbursed by New Millennium or if New Millennium paid the bills directly. The bills listed Mr. Jefferson's name on the account, and statements were sent to his residence.

While Mr. Holland claimed that he "had no intentions of pirating phones," he admitted at trial that he spoke with Verizon and was given control of Mr. Jefferson's old phone number. (Tr. pgs 152-53). Moreover, Mr. Holland did more than simply prevent Mr. Jefferson from using his old phone number, he used the number to try to capture Mr. Jefferson's business contacts or to damage his reputation. Mr. Jefferson had numerous business connections with home developers and realtors who would refer clients purchasing homes to Mr. Jefferson if they needed financing. For many of these business associates, the main way they contacted him was through his cell phone. Shortly after he quit at New Millennium, Mr. Jefferson sent out an announcement that he was moving to Chase, but many of his contacts, for whom he did not have their mail address, would not have received it. Mr. Jefferson attempted to regain his old number by contacting Verizon, and explaining what happened, but was informed that he could not transfer the number because it was now password protected.

Not only did he lose some of his business contacts because he lost his phone number and they could not contact him, but Mr. Holland disparaged Mr. Jefferson's reputation to at least some of the contacts who called the old number. Robert Zerfas, a realtor with Coldwell Banker who had referred clients to Mr. Jefferson in the past, testified that when he called Mr. Jefferson's number in the summer of 2006, someone other than Mr. Jefferson answered the phone and identified himself as working for New Millennium. Mr. Zerfas asked the person to have Mr.

Jefferson call him back and left his number. Shortly thereafter, he received a call back from Mr. Holland. Mr. Holland identified himself as the owner of New Millennium and indicated that Mr. Jefferson was not available. Later in the conversation, he went on to say that Mr. Jefferson was no longer with New Millennium, and had been fired because of a substantial amount of embezzlement and for engaging in predatory lending practices. This information initially scared Mr. Zerfas off from referring clients to Mr. Jefferson. Reputation is very important in the residential mortgage industry. Buying a house is often individuals' largest investment, and they need to disclose large amounts of personal finance information to obtain a mortgage loan. This trust is also necessary before a realtor or developer will refer business to a loan originator, since they are concerned about protecting their own reputation with potential clients. Mr. Zerfas testified that he was prepared to make Mr. Jefferson his "go-to guy" when he called the number and reached Mr. Holland. But, he was scared away by the call. Eventually, Mr. Jefferson was able to salvage his relationship with Mr. Zerfas after around six months of further communication and face-to-face meetings. But, during the six month period, Mr. Jefferson missed out on as many as four to six referrals from Mr. Zerfas. Moreover, Mr. Zerfas only came to trust Mr. Jefferson because he was the type to not necessary believe everything and was the type to try to "find out the truth" of the matter. But, because of losing the phone number and Mr. Holland's similarly disparaging comments made to other business associates, Mr. Jefferson permanently lost his relationship with Kathy Barbaccia, a realtor, Tracy Gignac, a builder salesperson with Ryland Homes, and Lisa Bass and Henry Sims, former clients who referred friends and family, as well as other former associates who referred business to Mr. Jefferson. Mr. Jefferson used to correspond with each of them about once a month, and was referred

business once every few months before the phone incident, but was unable to reestablish his relationship afterwards, despite making efforts to do so.

### C.     The Allegations of Car Theft and Embezzlement

While Mr. Jefferson worked at New Millennium, he purchased a car. He purchased the car through financing, but the title was put in New Millennium's name. Mr. Holland was aware of this arrangement. Mr. Jefferson asked Mr. Holland if he could structure the purchase this way for tax benefits, and Mr. Holland agreed. The car payments were deducted directly from Mr. Jefferson's payroll and Mr. Jefferson signed a personal guarantee on the car loan. He also paid the insurance on the car directly through personal checks. Shortly after Mr. Jefferson resigned, Mr. Holland became concerned that, because the car was nominally titled in the name of the company, it might suffer liability if Mr. Jefferson were involved in an accident. However, rather than contact Mr. Jefferson and ask him to return the car or get the title changed, Mr. Holland reported the vehicle stolen to both the Naperville and the Batavia Police Departments. The police investigated the allegation of car theft, but once they learned of the purchase arrangement, they closed the investigation. They deemed it a civil matter, requiring only a transfer in the certificate of title, rather than a crime. At trial, Mr. Holland himself admitted that reporting the car stolen was a mistake, and that it was at most a civil, not criminal, matter.

In June 2006, Mr. Holland again went to the police and accused Mr. Jefferson of embezzling up to $100,000 from New Millennium. The Naperville Police conducted an investigation in late 2006 and early 2007, and officially closed the case in early 2008. After conducting numerous interviews with the staff and accountants for New Millennium and

reviewing thousands of pages of documents, the police found no evidence to support a charge of embezzlement. The detective in charge of the investigation testified that he had multiple conversations with Mr. Holland, that Mr. Holland was clearly angry, and that he made multiple remarks that Mr. Jefferson needed to be in jail.

## CONCLUSIONS OF LAW

Section 523(a)(6) provides that: "(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt- . . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C.A. § 523(a)(6) (West 2010). To determine the nondischargeability of a debt under section 523(a)(6), a creditor must prove three elements by a preponderance of the evidence: (1) the debtor intended to and caused an injury to the creditor's property interest; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. In re Burke, 398 B.R. 608, 625 (Bankr. N.D. Ill. 2008) (citing Baker Dev. Corp. v. Mulder (In re Mulder), 307 B.R. 637, 641 (Bankr. N.D. Ill. 2004); Glucona Am., Inc. v. Ardisson (In re Ardisson), 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001)). The requirements of "willfulness" and "maliciousness" are distinct requirements in the statutory text and are usually treated as such by the courts. Delic v. Brown (In re Brown), No. 08-A-00936, 2009 WL 2461241, at *7 (citing 4 COLLIER, 523.12[2]; Carrillo v. Su (In re Su), 290 F.3d 1140 (9th Cir. 2002)). A creditor must demonstrate by a preponderance of the evidence the elements to establish an exception to discharge. Grogan v. Garner, 498 U.S. 279, 291 (1991); see also In re McFarland, 84 F.3d 943, 946 (7th Cir. 1996); In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994).

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Burke, 398 B.R. at 625 (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). Under Geiger and its stringent standards, to satisfy the requirements of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed. Burke, 398 B.R. at 625-26 (citing Geiger, 523 U.S. at 61-62). Thus, the debtor must have intended the tortious consequences of his act. Burke, 398 B.R. at 626 (citing Geiger, 523 U.S. at 61-62; Berkson v. Gulevsky (In re Gulevsky), 362 F.3d 961, 964 (7th Cir. 2004)). Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). Id. (citing Geiger, 523 U.S. at 64).

The Supreme Court did not define the scope of the term "intent" utilized to describe willful conduct. Recent decisions, however, have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required by Geiger. Burke, 398 B.R. at 626 (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463-65 (6th Cir. 1999); Tex. By & Through Board of Regents of Univ. of Tex. Sys. v. Walker, 142 F.3d 813, 823 (5th Cir.1998); Su v. Carrillo (In re Su), 259 B.R. 909, 913 (B.A.P. 9th Cir. 2001), aff'd, 290 F.3d 1140 (9th Cir. 2002); Fidelity Fin. Servs. v. Cox (In re Cox), 243 B.R. 713, 719 (Bankr. N.D. Ill. 2000)). But see Miller v. J.D. Adams, Inc. (In re Miller), 156 F.3d 598 (5th Cir. 1998) (employing an objective standard under which the "willfulness" requirement is satisfied if there is either a subjective intent to cause injury or an objective certainty that the conduct will cause injury). Because a person will rarely admit to acting in a willful and malicious manner,

those requirements must be inferred from the circumstances surrounding the injury. Burke, 398 B.R. at 626 (citing Cutler v. Lazzara (In re Lazzara), 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002)).

An act is "malicious" if it is taken "in conscious disregard of one's duties or without just cause or excuse. . . ." Burke, 398 B.R. at 626 (quoting Thirtyacre, 36 F.3d at 700). The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause and excuse. Id. (citing Paul, 266 B.R. at 696); see also Thirtyacre, 36 F.3d at 700. A debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. Burke, 398 B.R. at 626 (citing Thirtyacre, 36 F.3d at 700).

"Injury" means the violation of another's legal right or the infliction of an actionable wrong. Bukowski v. Patel, 266 B.R. 838, 844 (E.D. Wis. 2001) (citing BLACK'S LAW DICTIONARY 785-86 (6th ed.1990)). Injuries covered under section 523(a)(6) are not confined to physical damage or destruction; an injury to intangible personal or property rights is sufficient. See id. (citing In re Riso, 978 F.2d 1151 (9th Cir. 1992) (contract rights); In re Rushing, 161 B.R. 984 (Bankr. E.D. Ark. 1993) (real property)); see also 4 COLLIER, 523.12[4].

The Plaintiff has alleged that he was injured by two categories of statements made by the Defendant: 1. that he had stolen a car from the company and 2. that he had embezzled funds from the company or committed predatory lending practices. In each case, the Plaintiff has failed to prove the elements of Section 523(a)(6), but for different reasons.

The first claim fails because the Plaintiff has not proven by a preponderance of the evidence that the Defendant injured the Plaintiff by reporting the car stolen to the police. The Plaintiff did not allege that the Plaintiff was pulled over, arrested or otherwise suffered an injury.

Instead, the Plaintiff argues that, because the Defendant accused the Plaintiff of committing a crime, the statement was defamatory per se. Under Illinois law, a "plaintiff need not plead or prove actual damage to his or her reputation to recover for a statement that is actionable per se." Van Horne v. Muller, 185 Ill. 2d 299, 307, 705 N.E.2d 898, 903 (Ill. 1998); see also Green v. Rogers, 234 Ill. 2d 478, 495, 917 N.E.2d 450, 461 (Ill. 2009). In Illinois, "there are five categories of statements that are considered defamatory per se," one of which is "words that impute a person has committed a crime." Green, 234 Ill. 2d at 491-92, 917 N.E.2d at 459. However, the Plaintiff presented no evidence that the Defendant's allegation that the car was stolen was made to anyone other than the police officers taking the report. While Illinois law creates a presumption of injury for per se defamation, Illinois law also has a strong exception for statements made to police officers. "Defamatory statements that would otherwise be actionable will escape liability when the conduct is to further an interest of social importance such as the investigation of an alleged crime." Morris v. Harvey Cycle & Camper, Inc., 392 Ill. App. 3d 399, 404, 911 N.E.2d 1049, 1054 (Ill. App. Ct. 2009) (citing Thomas v. Petrulis, 125 Ill. App. 3d 415, 418, 465 N.E.2d 1059 (Ill. App. Ct. 1984)). Therefore, in Illinois, it "has long been held that statements made to law enforcement officials, for the purpose of instituting legal proceedings, are granted absolute privilege." Id. (citing Vincent v. Williams, 279 Ill. App. 3d 1, 7, 664 N.E.2d 650 (Ill. App. Ct. 1996)). "When absolute privilege attaches, no action for defamation lies, even where malice is alleged." Id. While Illinois is in the minority of states that afford absolute privilege to statements to law enforcement officials, id., 392 Ill. App. 3d at 405, 911 N.E.2d at 1056, the privilege is especially strong in Illinois. Thus, Illinois courts have protected statements to police officers even where the speaker knew the statement was false and even where the

speaker had an ulterior motive for falsely reporting the crime. See Morris, 392 Ill. App.3d at 406, 911 N.E.2d at 1056 (finding that car dealership was not liable for defamation for falsely reporting car as stolen to the police as a 'strong arm tactic' to recover the car without refunding the purchaser's down payment). Because the Plaintiff has only alleged that the Defendant made the statements to police officers and in the context of reporting a crime, the statements are protected under Illinois' defamation law. Therefore, the Plaintiff has failed to demonstrate an injury.

The second claim fails because the Plaintiff has not proven by a preponderance of the evidence that the Defendant's comments to the Plaintiff's business associates that the Plaintiff had embezzled money or committed predatory lending practices were "malicious" for purposes of Section 523(a)(6). Again, the Plaintiff seems to rest on the characterization of the statements as defamation per se under state law to satisfy the element of malice. However, the issue of nondischargeability is "a matter of federal law governed by the terms of the Bankruptcy Code." Grogan v. Garner, 498 U.S. 278, 284 (1991); Brown v. Felsen, 442 U.S. 127, 138-39, 99 S.Ct. 2205, (1979). Therefore, the elements necessary to find a claim nondischargeable are determined by federal law. Nova Datacom, Inc. v. Verzani (In re Verzani), No. 09-A-00162, 2009 WL 2998765, at *1 (Bankr. N.D. Ill. Sept. 18, 2009). Thus, while under Illinois law, where "words are held to be actionable per se, malice is implied," Mullen v. Solber, 271 Ill. App. 3d 442, 444, 648N.E.2d 950, 952 (Ill. App. Ct. 1995) (citing Hintz v. Graupner, 138 Ill. 158, 166, 27 N.E. 935 (Ill. 1891), the same is not true under federal non-dischargeability law.[1] Under Section 523(a)(6), "a defamatory statement is not 'malicious' unless the debtor knew the

---

[1] In contrast, the injury element of Section 523(a)(6) frequently involves state law, since the 'legal right' violated or the 'actionable wrong' inflicted will often arise out of state law.

statement was false when he made it." Merritt v. Rizzo (In re Rizzo), 337 B.R. 180 (Bankr. N.D. Ill. 2006) (Goldgar, J.). This is because a "debtor does not act in '*conscious* disregard of [his] duties,' in making a defamatory statement that he actually believes is true." Id. at 189 (citing Thirtyacre, 36 F.3d at 700).

Here, while the Plaintiff presented evidence that the statements regarding embezzlement were in fact false, he presented no evidence that the Defendant knew the statements were false at the time he made them. To the contrary, the Defendant testified that he still believes that the Plaintiff embezzled funds from his company. The testimony of the police detective in charge of the investigation was sufficient to support the Plaintiff's burden of persuasion that the Plaintiff had not embezzled money, but the detective's testimony actually supports the Defendant's assertion that he believed the Plaintiff had embezzled money. The detective testified that, from his dealings with Mr. Holland during the investigation, Mr. Holland "was angry. He felt that Mr. Jefferson had stolen some money from him, and he wanted it back." (Tr. pg.115). Perhaps Mr. Holland should have realized that his suspicions were unfounded after the police investigation was closed and all charges were dropped, but that was not until the early months of 2008. In contrast, from the evidence presented the only statements made to business associates on the 'pirated' phone number occurred around the time that Mr. Jefferson resigned in April 2006. The Plaintiff presented no evidence to demonstrate that Mr. Holland knew his allegations were false at that time. Therefore, even if the Plaintiff has a valid claim for defamation under state law, he has not demonstrated that it should be considered non-dischargeable under Section 523(a)(6).

## **CONCLUSION**

For the foregoing reasons, the Court finds that the Plaintiff has failed to meet his burden to demonstrate that the defamation claims against the Defendant are non-dischargeable under Section 523(a)(6), and therefore finds in favor of the Defendant.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: April 22, 2010

The Honorable Manuel Barbosa
United States Bankruptcy Judge